Good morning. I'm Kathleen Kennedy. I'm here with the Jefferson County District Attorney's Office. We're here to decide whether or not Commissioner Sinegal is entitled to qualified immunity based on his Secretary's claims that he terminated her in violation of her First Amendment rights. In looking at the plaintiff's First Amendment complaint, as well as her is claiming two types of speech. One is the actual running for office and two is for making critical statements against the person she was running against, Justice of the Peace Gillum. In her petition, she states that Polk asked her if, excuse me, Polk asked Sinegal if she was being terminated because she had opposed Gillum for the position of Justice of the Peace. She further states Polk exercised protective speech when she spoke out against him, in which he was an incumbent. Now, whether or not the right to run for office, as she has alleged, was a clearly established right, was not established until after she was terminated. I'm sorry, ma'am, but that doesn't impress me. I mean, for employee speech now, we're governed by Garcetti. And Garcetti talks about anything that's related to the employee's job and to run for public office. That's, she's engaging in political activity, and therefore it's protected. Well, this case, this court . . . That is, that's one of those things. I'm very, as most people probably figure out, I'm very reticent to say what clearly established law is, but running for public office seems to me quintessential political, I mean, so clearly established that it's not debatable. Well, the political activities that she would be engaged in, such as public speaking or what her platform is and what her campaign is against Gillum, would be one thing. But she's never correlated any of that to the reason that she was terminated. Well, that's another matter. Right. So, and I would cite for, if she's arguing that she was terminated solely for being terminated. Now, for, for her to assert that she was terminated because she ran for office, the district court claimed that that was a fact issue. But it's not a fact issue when there's no evidence. In the case of Jordan v. Ector County, the argument that the city provided was that there was no evidence. But this court said, this is not a case where the only evidence is a sequence of events or plaintiff's subjective beliefs, which is exactly what we have here. If you read her deposition and you, and you look at her first amendment complaint, she just goes through what transpired when she told Senegal that she was announcing and everything from then. She was elected to the office she was running for. Could she have held her present position? I'm sorry, I didn't hear the end of that. She works for a county commissioner and she's running for a second office. If she's elected to that office, would she continue to work for the county commissioner? She would have continued to work until the justice of the peace would have either resigned or finished. She would have continued working for the commissioner until either the, until January. Would she take the office? Could she hold both jobs? I believe she could probably hold both jobs until, until he ended with his term in December 31st. It's quite clearly first amendment activity, but it's not so clear to me that the commissioner can't say, that's fine, run for office. But look, you're going, you're seeking another office here. I've got to have an employee who's going to stay here, et cetera, et cetera. What other reasons are, and if you want to run for office, fine, but go run for it. But not for me to be the placeholder for you to get elected to another office. The county does not have any such policy that she would have to resign her position to run for that position. Is that what you were asking? I'm just raising the question with you, the question of the right to run for office. We have a whole range of cases dealing with situations where an individual runs for office and comes in and fires the people who didn't support them, et cetera, et cetera. But, but this is a little different, this is a little different, all I'm saying to you, this is a little different first amendment argument. That is that, that I'm employed by an officeholder and I want to run for office. And, and I want to hold my job while I run for office. Although if I'm elected to it, I no longer will have that job. My question is, step on first amendment rights for the employer to say, fine, well and good, go run, but you can't stay here and use this as a base. I mean, that's a question I just wanted you to address. It's possible. It presents it in a different way to me than our usual pattern first amendment cases and these types of political activity cases. This case is kind of different in the onset because you don't have just a basic employer employer relationship to begin with. You have an employer whose secretary, as her own testimony was, they're family like. He was, he, before he was commissioner, he was a special ed teacher. Ms. Polk's mother was his aide. Commissioner Senegal's sister was married to Ms. Polk's family. So there's a little bit of a different relationship. And the testimony has been that they went to HR to make sure that she followed the county policy that you cannot campaign on time to protect her and to make sure everything was fine. So he didn't terminate her or say you need to leave because you're running for office. They had no extent policy about that practice. No, there's no policy like that. But at the same time, she hasn't shown where Senegal, her testimony with Senegal didn't go to any of her campaign speeches. They didn't talk about her campaign in the office. Everything was just businesslike in the office. She makes no out... The fact that the commissioner created some memos to the file allegedly after, well after the fact about his allegedly counseling her for inadequate performance. Right. So I think that's going to the argument of pretext. Well, no. It also, well, it would also pretext in causation and motivation and so on. Well, because they had that family-like relationship, he did not write down everything about her. He knew this woman, and so he counseled her whenever there were things that were wrong. He talked to her. They had office meetings. And he did everything orally. He didn't write it down. There's no county policy that it had to be written. What happened to the family-like relationship that compelled him to start memorializing events and occurrences and making a record? What happened? Did something happen in the family-like relationship? No, it was basically her performance there. He was getting phone calls from constituents and other employees, very, that she was being rude. You were saying that before, though, even if that happened, he just, he would talk to her, but he wouldn't make any record on it. No. Your position is it was occurring before. He just never reduced it to writing. That's correct. But then something happened, and he decided to do that. To do, to write. To reduce it to writing. Well, he, what he hoped was that she'd get elected to that other office, and she'd be off his hands. That is correct. But when it didn't happen, then he was forced to do something to protect himself. So. But that, but the problem is that's a fact issue. Well, if we get to pretext, so that's what his argument is, because he reduced it after she was terminated, that it was pretextual, and that shows motivation. But you can't just argue pretext, and just writing something down after the fact wouldn't make it pretextual, because had he never written it down, and then she filed this lawsuit, and he wrote all those reasons down in an answer to an interrogatory. Yeah, but I, you know, it seems to me hard to rebut what, I mean, Judge Crone disposed of this in one paragraph, and it has to do with this dispute revolves around whether Polk's exercise of her right was a motivating factor in her termination. And on one side, you have the fact that it occurs right after she had run for office, and he said it caused him problems, the way she had talked about Gillum. And on the other hand, he says, no, it was really a course of poor performance. I mean, I don't see how you can resolve that on summary judgment. Well, I go back to the fact that it wasn't clearly established. And I have to cite the case of James v. Texas-Collin County, which was in 2008. In 2008, this Court said, it is unclear whether First Amendment provides a right to run for public office that extends to government employees. So at the time that this occurred — It has nothing to do with this, because the fact is her boss told her, fine, go run for public office. Right, to go do everything. But her allegations are that she was terminated for running. So if he says, go run, and then she comes back and says, well, I was terminated because I ran for public office, and what is — how does she connect it? You're saying that motivation doesn't — as a matter of law, there can be no such retaliatory motivation under this circumstance. You're not saying she doesn't have a clearly established right. You're saying that there was no — that could not have been a motivation. That is correct. I'm still going with James v. — the case from 2008 were — Well, if he had told her no, then there would have been — then you couldn't say that was retaliation or not clearly established law because of James. He told her yes. And therefore, you're saying that can't be the basis for retaliating. But her basis for retaliation is that he reduced it to writing after she was terminated because there's no comments that he made. There's no outward negative conduct that he did to her. I mean, a perfect example of pretext and motivation is in — Did he ever say anything to her about you causing a problem for me or putting me in a bad position by running? There weren't those conversations. There was only one — most of his — all the conversations that she lists were very positive. I'm glad you're running. You'll be great. You used to work in that office. You need to make sure you get your campaign stuff together. He was very supportive. And then there was one comment where he says — he's going around telling everyone, I put you up to run and you don't know what position you put me in. But there's not really any context of what that means. It could mean — there's five people running for this justice of the peace spot, so five people. So it's Ms. Polk, Gillum, and three other people. He might have been supporting someone else, and now everyone thinks he's supporting her. There's no telling what that statement means because there's really no context to put it in. But if you look at the — It doesn't sound good. It doesn't sound good. But to have one statement like that that could mean almost anything, we're assuming that it means something bad. But for her to establish pretext, which is pretty much what all her briefing is in this case, a perfect example is this court in Click v. Copeland, where two sheriff deputies decided to announce their candidacy against their boss, the sheriff. At the time they announced, he transferred those two law enforcement deputies over to the jail. And they said, why are you transferring us over here? And he said, because we have a shortage of personnel in the jail. But funny, at the same time, he transfers five people out of the jail into law enforcement. And then shortly after that, he tells Click, as soon as the primaries are over, I'm going to fire the hell out of you. And then a little time later, he sends four more people out of the jail over into law enforcement. So his reason for transferring him was for a jail shortage of personnel, but yet he transferred nine people out. This court basically said, no, that's not the real reason. And I cited that there's a Seventh Circuit that basically came right out and said, pretext is a phony excuse. You have to show a phony excuse. We don't have that here. And, in fact, this court in Jordan v. Ector, just a sequence of events and her belief doesn't get you there. And that's exactly what she has is her belief of why she was terminated. And her testimony was, question, you don't believe that Senegal terminated you for not giving him his memos or message in typing. Is that correct? Her answer, quote, no, I don't. I believe it was all behind the election. Question, what do you mean by that? Answer, the previous conversation that he and I had about when he said, you don't know what type of position you're putting me in, that led me to believe that he's afraid of Gillum. Gillum can be a bully. And I just think Senegal was afraid of him. And that said, record on appeals 774 to 775. And so then I asked her, so even after you lost the election, lost the recount, you still felt Senegal believed you were a problem? Answer, I believe so. And what would lead you to believe that? Quote, I was a threat. I was a threat. He probably thought I was going after his job. So she has a belief that everything was behind her running for office, but there's nothing. There's no comments other than that one that we just pointed out. There's no negative treatment. She doesn't show that he treated her any differently than the other secretary. There's nothing but a subjective belief and a chronological citation of what happened. And in this case, as this Court said in Jordan v. Ector, that's not enough. This Court also held in James v. Texas Collin County that there's no evidence that he was terminated because he ran for office. Even though there were things about his running, it came down to more of a policy violation, which we don't have here. So under a pretext, she has to go through and basically rebut each discrete reason proffered by the employer. She doesn't do that. She doesn't discount them. She may disagree with kind of how it went down, but she doesn't come back with a phony excuse. Well, a lot of this criticism of her work, though, is pretty subjective. In other words, she made the constituents mad. Well, maybe the constituents were angry people to begin with. I mean, if you're not counseled at the very time of an event like that, it's real hard to come back in retrospect and say, obviously, she's hurting my position with my constituents. But there was counseling. There was counseling. Well, he only said that after the fact, right? Well, I mean, okay. Well, you have plenty of time for rebuttal. And I kind of have to keep going back, too. It wasn't clearly established. I don't mean to be rude, but your red light's on and you have time for rebuttal. Sorry. Mr. Watts. May it please the Court, Judge Jones, Judge Higginbotham, Judge Grace. So which of those facts do you believe? If I'm not mistaken, you can't weigh in on any of them. The fact is that at the trial court, Commissioner Senegal did not dispute that there was an exercise of protected speech. He did not dispute that there was an adverse action. He did not dispute that the exercise of speech outweighed his right to efficiency. The only thing that he disputed was causation. When the judge wrote her memorandum opinion, I suppose that if there had been a bona fide error of Mr. Senegal and not having contested something that he should have, he could have filed a motion for new trial and attached evidence. But he didn't do that either. So here we are. Senegal's sole argument for qualified immunity concerns controverted questions of fact. To be clear, your First Amendment-asserted violation is terminating her because of her criticism of the person she'd run against. Well, Judge Crone pointed out in her review of the complaint in the record that the exercise of free speech was running for office, opposing Gillum, and criticizing Gillum. She mentioned those three things as being issues, and those were what my client did. She chose to run for office, opposing Tom Gillum, a very powerful figure, and to criticize him as a man of diminished integrity. She continued to criticize him after she lost. Well, that's right. She did lose, and so she had a right to run and win or lose, and she had a right to run against Gillum and win or lose, and she had a right to criticize Gillum, whether with effect or without. I want to say a point. You ask a question of counsel, well, what about her running and holding office? And all of this goes to the stuff that wasn't raised at the trial court. But when— I didn't understand. I think you've got a pretty clean argument here on the First Amendment when you're talking about her speaking out against actions being taken against her for expressing her views with regard to some other holder of public office. But what I was suggesting is that this—what I really don't believe is in this case is that—I was trying to clarify that it's not really in this case. It's not essential to your case that the employer can't insist that an employee would take a step down from the office if they're going to become a candidate for public office. All right. Now, I'm going to confess to you that I have a hearing aid that doesn't always work well. We're in trouble, because so do I. I'll trade you. The—I think I heard what you said. Yes, sir. And I— You can fill it in as you want to. The—let me say that when Ms. Polk, who's with me in the courtroom today, but when Ms. Polk first told her boss who had—that she was going to run, as we pointed out, it was a congratulatory, we know what a pain Gillum is, la-di-da-di-da. Then we know that he comes back later and he says, oops, he's saying I'm going to put you up to it. Now, he said, but you're going to have to follow the rules of the county if you do, which means you can't campaign on company time and you can't campaign on company property. And she says, fine, I'll handle it on off time and I'll do it like it's supposed to be done. We know that at the beginning, by the way, that some—or somewhere in there that the human resources director, Carrie Erickson, told the commissioner, by the way, you—and this is when the reframing of the facts occurred. And the reframing of the facts occurred after the firing. But when the reframing of the facts occurred, suddenly Commissioner Senegal says, oops, I was going to fire in 2012, but suddenly I was told I couldn't because she was going to run for office, protected right. So I had to lay off. Well, interestingly enough, there are no memos, no conversations, family stuff had nothing to do with it. She was there five years and never criticized in paper or in voice by her boss. Let me ask you about one telltale sentence at the end of Judge Crone's opinion where it says, Polk asserts that Senegal began gathering statements and affidavits corroborating his version of events once he became aware that she had filed a claim with the EEOC. Oh, that's right, EEOC and—or this lawsuit. I asked him the question on deposition. Well, are you telling that before her having filed an EEOC charge or filing this lawsuit, he was not clear, whichever case— Was that defending also some discrimination claim? It may have been. That's—I don't think—it's not now, certainly. I mean, that would not be—if that were his motivation, that would not be retaliation for her political speech. Well, frankly, I'm not sure that that was ever pending. That's not the issue. What was the issue was that she was challenging her termination. And once—and he said—I asked him, except for her having in effect challenged—I'm putting that in a box—challenged your terminating her, would you have altered the calendar? Would you have done all this other stuff? And he said, no. What he said, it's fair to say no. He wouldn't have. That's a but-for that comes around at the end. All of this is—you don't have, with all due respect, jurisdiction to hear this at this time. Judge Crone got it right. Judge Crone said, look, you didn't shout—you didn't contest the free speech then—they're doing it now, they're trying to reframe that law now—that you didn't challenge the adverse action then, and you didn't challenge the outweighing of her free speech right—of your right to efficiency by her exercise of free speech right. So that leaves the only thing for me to decide is when do we go to trial, in effect. It's a jury issue. All this other stuff. Well, let me ask you—I mean, I think Ms. Kennedy's main argument—significant argument here is that all she stated was a subjective belief that this was retaliation for things connected with her attempt at political office. Merely her subjective belief, because the only affirmative statement is the one, you're making trouble for me. Is that enough? I think— Is there other evidence? Now, Judge Jones, I don't very often ask you to repeat a question to me, but at this time I'm going to with all— Is there a fact issue about motivation, his motivation? Which is a causation issue, right. And what is your evidence that he was motivated by retaliation for her run for office? Well, you can look at the fact that, first of all, there was no criticism for the performance claims. Two, there was an alteration post-lawsuit of evidence. Number three, that there was a digging up of supportive reasons from his employees and— I mean, that is all after the fact, for sure, but can we transform that into retaliation because she was—of the way she was running for office and seeking a recount and all that? With all due respect, in the five decades plus that I've been practicing law and nearly five decades that I've been at this Court, I have never—doing civil rights stuff, I have never had a defendant come to me or in a deposition or in a pleading and say, you know, the real reason I did this was because of an exercise of a protective right. I've just never seen it. I don't—objective belief. I think that if you take all of the circumstances, put them together, shake them up, press them hard, they come out one way. He may have had—if you look at the Price Waterhouse, he may have had justification or claimed he had justification in 2012. But when 2014 rolled around, whatever he had in 2012 that had been unexercised, undocumented and untalked about didn't necessarily mean that he had in 2014 a good motive. All I have to have in a mixed motive, I have to have a little bit of both, and he relies on the wrong one, and that's for a jury to sort out what he did. That's— Yeah, but, I mean, you can—so the only evidence that he was motivated by retaliation for her political activity is his comment—I mean, yes, there's pretext of some kind, but whether it was pretext for discrimination of this sort, it's just, you caused me trouble with Gillum. Are there other circumstances surrounding his relationship with Mr. Gillum that might fortify that idea? Well, the fact is that Gillum was a vindictive man. He's—I'm going to the record only. I can go beyond the record and tell you anecdotes all day, but in the record, he's a vindictive man. He had come nearly to a fistfight with Senegal. He had threatened Senegal. There was—Senegal was—he had his own—he wanted rid of Gillum. The question is, after my client ran for office and lost, or it looked like she was going to lose probably, he decided that maybe that he ought to be more practical and go with the winning team. The whole fact is that there is a sorting out of this process, and the sorting out of the facts as to what Commissioner Senegal thought and how he was motivated, that's going to be left for a jury, I think. There are only four—I just can't understand why—and if I sounded amazed in my brief and disbelieving, the Court decides whether or not there's free speech. They never had any argument about it. The Court said, here it is. OK. They never disputed that. Number two, the Court says, was she fired? Well, no doubt she was. Number three, how do you balance it? Number four, the substantial emotive vetting, the Mount Healthy test, that always goes to a jury. The judge pointed that out. And this Court has historically, for a long line of cases, we don't have that jurisdiction. The most recent case I found is Haney v. Roberts, a 2017 decision by Judge Prado. And we shouldn't be here. This is a waste of your time, my client's money, and I enjoy it, but— We don't have jurisdiction if there are disputed issues of genuine issues of fact. We have to determine whether we have jurisdiction. Unfortunately, that requires us to look at the question of whether there are disputed issues for fact in this context. So there's a jurisdictional label to it, but it effectively gives the parties a chance to argue more than just the jurisdiction reaches into whether there are disputed issues of the summary judgment. I think there are, but— Well, if there's a disputed issue of— If we determine that, then we dismiss the appeal. I'm sorry, Your Honor. If we determine that that's so, then the result of that is we dismiss the appeal. Well, Judge Cohn found that there was a disputed issue of fact. That's her job. That's her responsibility. Her paycheck covers that. And I don't think that you can make that decision for her. I think you can decide whether or not there are the facts that show that when you apply, as she did, the law to what—to the alternative, A door, B door, that did she have sufficient facts at that point. Yes, Your Honor. I understand that. And I didn't mean to argue with you. No, no. I think we're on the same page. And if you don't have any other questions, I'll give you all the time back that I haven't used. All right. Thank you. I sure would have liked to have had it yesterday. Thank you very much. All right. Just real quick. The answer to your question was it was—he made these documents in response to an—it was either an EEOC or an unemployment. I get this one confused with another one. But if Marsha Crone—excuse me, if Judge Crone said that it was EEOC, then that's what it would have been for with the deposition testimony. So if he hadn't have answered the EEOC with what had occurred, then I guess the EEOC could have brought a lawsuit against Commissioner Sinegal. So he had to do that in order to answer. And I guess if he's claiming that it's a pretext to answer that, then is Sinegal actually being punished for answering an EEOC charge? You're saying you don't know whether it was an EEOC charge or a claim for unemployment. I think Judge Jones read out of the memorandum and order, okay, this one was an EEOC charge. Okay. Then that's what he was responding to was the EEOC charge. Ms. Polk's attorney touched a little bit about Gillum—Judge Gillum and Commissioner Sinegal's relationship. They did not like each other at all. I can make the argument that her running for office and him hoping that she won would have probably killed two birds with one stone, as you said. He would have gotten rid of a bad employee and probably lost an enemy as well in the process. He was very hopeful that she would win. But I come back to what we talked about, and, Judge Jones, I know you're not impressed with this argument about whether or not the right to run was a First Amendment right. Most of those cases deal with when you have a rivalry between the person who terminated and the person who ran. We don't have that here. So in 2008, when this Court said it's unclear, and I know that there are other cases, it could be an association case, it could be the rivalry type cases, neither one of those we have in this case. So you have all those cases, but then you have this Court saying it's unclear. I'm not sure how an official is supposed to have fair notice that, OK, this is not my opponent, and I'm terminating her for other reasons. What was the case that you say is unclear? It is James v. Texas-Collin County from 2008. All right. And then this Court did address it again in Phillips v. City of Dallas, which I think might be where your question came up. This gentleman was terminated because he was running for office, which was against the Dallas City Charter. Oh, well and good. I was just trying to put that to one side because it's a more difficult area. Your major problem is with where she was plainly engaged in First Amendment activity, if the jury should feel fine, and in terms of continuing to oppose or criticize her opponent, and that's protected activity, and if the jury finds that that's why, and they found any up or down with it. But that strikes me as a—that's the First Amendment look at it. In other words, I don't think the plaintiff here has to rely or is relying upon the First Amendment rights. He allowed her to run for office, and then so anyway, that's a different—it's a rabbit trail. We don't need to go down. And the issue really comes down to whether or not Senegal fired her because she ran for office or because she said something about Gillum, which we don't have exactly what she said against Judge Gillum. We just have her conclusory statements that she criticized him. Fine, that is free speech in your campaign to talk about your opponent and things like that. I'm not disagreeing with that. If we think there's a genuine issue of fact about that, then the case drops back down and you go to trial. But the issue is whether or not he terminated her for any First Amendment right. And there's no evidence that there was any substantial or motivating issue. I'm just trying to describe to you where we are in terms of the process, not merits of the case. Let me frame the question for you, frame the question that we have to answer on appeal, which is are there genuine issues of fact that a jury needs to decide, and in which event, in our jurisdiction, it ceases. Well, if there's no evidence, there's not an issue of fact. I understand. I understand your argument. But my argument also starts with the First Amendment, that it's not clearly established and Senegal would still have qualified immunity. She's never connected the dots to her termination and her campaign activities. And I'm sorry, I'm out of time unless you have other questions. Thank you very much. Court will be in recess until 9 o'clock tomorrow.